UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

NABIL MANLEY,

                    Petitioner,

          vs.

ROSEANNE CAMPBELL, Warden,

                    Respondent.

No. 2:03-cv-00030-JKS

MEMORANDUM DECISION

      Petitioner Nabil Manley has filed a petition for habeas corpus under 28 U.S.C. § 2254. Petitioner is currently serving a term of 83 years to life in the custody of the California Department of Corrections and Rehabilitation.

PRECEDING PROCEEDINGS

      Petitioner was found guilty after a jury trial in the California Superior Court, County of Sacramento, on a 10-count indictment: four counts of forcible rape (CAL. PEN. CODE § 261(a)(2)), two counts of forcible oral copulation (CAL. PEN. CODE § 288a(c)), one count of first degree robbery (CAL. PEN. CODE § 212.5(a)), and one count of kidnaping to commit robbery (CAL. PEN. CODE § 209(b)) to which counts the jury found he was armed with a knife (CAL. PEN. CODE § 12022(b)) on October 6, 1995, and was sentenced to a term 83 years to life on April 10, 1996. Petitioner timely appealed to the California Court of Appeal, which affirmed his conviction in an unpublished written decision. Petitioner's petition to the California Supreme Court was summarily denied without opinion or citation to authority on January 14, 1998.[1] Petitioner did not file a petition for *certiorari* with the U.S. Supreme Court and his conviction became final 90 days later, April 14, 1998. *See Wixom v. Washington*, 264 F.3d 894, 897 (9th Cir.2001).

---

[1] Mosk, J. was of the opinion that the petition should be granted.

On December 18, 1998, Petitioner, represented by counsel, filed a petition for a writ of habeas corpus in the Sacramento Superior Court, which was denied in a written decision on February 16, 1999.[2]  On December 27, 1999, Petitioner, represented by counsel, filed a new petition for a writ of habeas corpus in the California Court of Appeal, which was summarily denied without opinion or citation to authority on January 20, 2000.  On January 16, 2001, Petitioner, represented by counsel, filed a petition for a writ of habeas corpus in the California Supreme Court, which was also summarily denied without opinion or citation to authority on June 27, 2001.  On August 20, 2001, Petitioner, appearing *pro se*, filed a petition for a writ of habeas corpus in this Court, which was dismissed on April 17, 2002, without prejudice before answer upon motion of the Petitioner.[3]  Petitioner, appearing *pro se*, then filed a successive petition for a writ of habeas corpus in the California Supreme Court on May 16, 2002, which was denied on November 20, 2002, citing *In re Clark* (1993) 5 Cal.4th 750 [855 P.2d 729]; *In re Miller*, (1941) 17 Cal.2d 734 [112 P.2d 10].

FACTS[4]

On July, 29, 1992, Fran S. was living in a condominium in Sacramento. Sometime after 11 p.m. a man entered through the bathroom window, leaving a muddy footprint on the counter near the sink.  He threatened to kill Fran S. if she did not stop screaming.  He put a pillow case over her head.  Over the next several hours he committed numerous sex offenses against her and took money from her purse.

Near the end of her ordeal the rapist had Fran S. dress and blindfolded her with a scarf in order to go to an ATM to obtain money.  He told her he knew she drove a red car.  He made her walk out of the condominium to the place where

---

[2] The Court notes that in its decision the Sacramento Superior Court refers to an earlier habeas petition filed in that court that was denied on June 3, 1996.  Copies of the petition and order in that proceeding are not included in the record lodged with this Court.  However, inasmuch as that proceeding has no apparent direct impact on the outcome in this proceeding, the Court finds it unnecessary to require augmentation of the record.

[3] Respondent had filed a motion to dismiss the petition as being "mixed," *i.e.*, containing both exhausted and unexhausted grounds.  Petitioner filed a motion requesting an extension of time within which to respond to the motion to dismiss, which was denied by this Court.  Petitioner then filed his motion to voluntarily dismiss the petition, which was granted.  *See* FED. R. CIV. P. 41(a).  The Court did not rule on Respondent's motion to dismiss

[4] As recited by the California Court of Appeal in its unpublished decision.

she customarily parked her car, about 50 feet away.  When she told him the car had an alarm he walked her back to the condominium.  As they walked back another male yelled. She opined he yelled: "Hey Gil!"  Her assailant did not respond.  Once inside her condominium, he put her in a closet and left.

Fran S. called the police soon thereafter. She was taken to the University of California at Davis Medical Center and examined.  Swabs from her vagina and the bottom sheet from the bed tested positive for sperm.  Fran S. had not had intercourse for years before the attack.

The following afternoon a police detective found two screens off the windows of Fran S.'s condominium unit, a flashlight lying in the flower bed beneath those windows, and a footprint in the wet soil next to the flashlight.

The defendant, whose given name is Nabil, lived next door to the victim's condominium.  Fingerprint impressions matching the defendant's were discovered on the batteries inside the flashlight.  On September 2, 1992, police searched the defendant's house.  His mother directed them to his bedroom; she told the police that his brother sometimes also stayed there.  In the closet was a pair of black L.A. Gear shoes, size 11, matching the footprint in size and sole pattern. The defendant was wearing size 10 shoes at the time of the search.

Electrophoresis testing of the vaginal swabs and the bottom sheet showed that the defendant could have been the donor of proteins found therein that could not be attributed to Fran S.  About 52 percent of the African American population is consistent with this ABO and PGM (phosphoglucomutase) profile.  However, these tests were inconsistent with defendant's brother and he thereby was excluded as the possible rapist.

RFLP (restriction fragment length polymorphism) tests of DNA (other than that of Fran S.) extracted from the vaginal swabs and the bottom sheet showed that the DNA matched the DNA of the defendant at five sites on the DNA molecule where the human population has highly differing numbers of repeated patterns of the characteristic DNA bases, tandem repeats.  The DNA from defendant's brother did not match the pattern found in the tests, confirming that he was not the rapist. The chances of two unrelated people having the matching numbers of repeated patterns at a series of these sites is very remote.

The prosecution's expert witness testified that under the product rule method of calculation the respective probability of persons in the following groups having the tandem repeat profile revealed by the tests was: African Americans 1 in 55 million, Caucasians 1 in 8.9 million, and Western Hispanics 1 in 2.1 million.  She testified that under the more conservative modified ceiling principle of calculation, which uses the highest probability of occurrence of the detected patterns for any ethnic group at each site, the aggregate probability of a person having this RFLP profile was 1 in 100,000.

The defendant's mother testified as follows.  The shoes found in the closet matching the footprint under the window of Fran S. belonged to defendant's brother.  On the night Fran S. was raped she and the defendant had been at a friend's house together and returned home between 11 p.m. and midnight.  She awakened around 3 a.m. and talked with the defendant for a couple of hours thereafter.

The defendant and his brother told her that they had been working on his brother's car outside the condominium complex and had thrown the flashlight over the gate to the complex because they did not yet have the key to enter.  She had not given them a key because she did not want to pay for an extra key.  She conceded there was a nearby pedestrian gate to the complex which operated by a code.  She said they did not know the code for the gate; she did not have it "up there for my particular unit."

A police detective testified that there was no lock on the pedestrian gates to the condominium complex on July 30, 1992.  The resident manager of the complex testified that the locks were not installed on those gates until August of that year.

The police detective testified that he asked the defendant's mother to account for the flashlight on September 7, 1992. She said at that time that the defendant had told her the day before that "he had been fooling around with the -- the flashlight and had dropped it in some bushes and then forgot to go back and pick it up."  She had said nothing about her sons working on a vehicle or throwing the flashlight over the gate.

## PETITION BEFORE THIS COURT

On January 9, 2003, Petitioner, represented by counsel, filed the petition for a writ of habeas corpus now pending before this Court, which petition was amended January 21, 2003.  In his petition, as amended, Petitioner has raised six grounds.

Ground 1:  Because a juror was influenced by outside materials and another juror commented that Petitioner was likely to be guilty because he was black, Petitioner's Sixth Amendment right to an impartial jury was violated.

Ground 2:  Petitioner's conviction was based upon inherently incredible evidence in violation of the due process under the Fourteenth Amendment.

Ground 3:  His conviction of kidnaping was based upon insufficient evidence in violation of due process under the Fourteenth Amendment.

Ground 4:  Inadequate jury instruction on the asportation element of kidnaping violated the Sixth Amendment right to a jury trial and due process under the Fourteenth Amendment.

Ground 5:  Denial of effective assistance of counsel under the Sixth Amendment in that counsel failed to:

(a)      have the jury question regarding the distance required to satisfy the asportation element kidnaping adequately answered;

(b)      present exculpatory evidence that victim had contracted genital herpes as a result of the sexual assault and Petitioner did not have genital herpes;

(c)      request a continuance to investigate new evidence introduced at trial; and

(d)      investigate and present available evidence corroborating Petitioner's alibi defense.

Ground 6:  Use of the "floating bin method" of comparing genetic marker's was inherently unreliable in violation of Petitioner's due process rights under the Fourteenth Amendment.

Petitioner raised the second ground in his direct appeal.  The first, second, third, fourth, fifth and sixth grounds were presented at least in part in his first round of habeas petitions presented to the Sacramento Superior Court, California Court of Appeal, and California Supreme Court.  All six grounds were presented to the California Supreme Court in his second petition for habeas relief presented to that court.[5/]  Respondent concedes that all grounds presented in the petition currently pending before this court have been exhausted.

TIMELINESS

Petitioner filed his petition after April 24, 1996, therefore, it is governed by the one-year limitation period set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2244(d)(1), unless the time was tolled under § 2254(d)(2).  Absent tolling, the petition was due April 14, 1999.  The record in this case shows that the petition pending before this Court was filed nearly five years after the conviction became final and more than 18 months after the California Supreme Court denied his petition for a writ of habeas corpus

---

[5/] The Court notes that in citing *In re Miller* (1941) 17 Cal.2d 734 [112 P.2d 10] in the second habeas petition presented to it, the California Supreme Court was signifying that all issues presented in the second petition had already been presented and ruled upon either on direct appeal or the first round of habeas petitions in the state court.  It thus appears that Respondent's motion to dismiss the first petition in this Court may not have been well-founded.

in the first round of state petitions for post-conviction relief.  As the petition appeared untimely on its face, the Court issued an order *sua sponte* directing the parties to file supplemental memoranda addressing the issue of why this petition should not be dismissed as untimely.  The parties, in response to that order, have filed supplemental memoranda.

Whether or not the petition is untimely depends upon three independent issues: (1) whether Respondent has waived the limitation period as a defense; (2) the extent, if any, to which the limitation period was tolled during the pendency of the first round of habeas petitions in the state courts; and (3) the extent, if any, to which the limitation period was equitably tolled.  If the Petitioner prevails on the first issue, the timeliness question becomes moot and it is unnecessary to reach either of the remaining two.  On the other hand, if the Respondent prevails on the first issue, Petitioner must establish that the limitation period was tolled, either by the pendency of post-conviction proceedings in the state courts or equitably, for all but one year during the period between April 14, 1998 and January 9, 2003.  Put another way, if the untolled time exceeds twelve months, the petition is untimely.

Petitioner argues that by failing to raise the issue in her answer Respondent has waived the limitation period of § 2254(d)(1).  In particular Petitioner argues that, unlike the situation in *Day v. McDonough*, 547 U.S. 198 (2006), where the *sua sponte* order came nine months after the respondent had filed an answer, the order in this case came more than three years after the case had been fully briefed.  Petitioner further asserts that "substantial proceedings have occurred in this case."  What substantial proceedings occurred in this case, in which there has been a petition, amended petition, answer, and traverse, in addition to those present in *Day*, is not apparent from the record.  Petitioner has, however, raised an alternative argument that raises a somewhat weightier issue.  In *Day* the Attorney General made a simple miscalculation of the tolling time under existing circuit precedent.  In her supplemental memorandum Respondent asserts that her failure to raise the limitations period as a defense was not an attempt to waive it.  "Rather, Respondent erred in calculating the relevant time periods based, in part, on then-controlling circuit law."  Respondent argues that *Pace v. DiGuglielmo*, 544 U.S. 408 (2005) and *Evans v. Chavis*, 546 U.S. 189 [126 S.Ct. 846] (2006) represent changes in controlling law making an amendment to the answer appropriate.

In *Chavis* the Supreme Court reversed a decision of the Ninth Circuit [*Chavis v. LeMarque*, 382 F.3d 921 (9th Cir.2004)] that had held a three-year delay between the denial of a petition for a writ of habeas corpus in the state court and seeking review by a higher court was a "reasonable time" within the California rule and, therefore, included in the tolling period.  The Supreme Court also indicated that it "found no authority suggesting, nor found any convincing reason to believe, that California would consider an unjustified or unexplained 6-month delay 'reasonable'"  546 U.S. at ___ [126 S.Ct. at 854].  In *Pace*, the Supreme Court made clear that what it had intimated in *Carey v. Saffold*, 536 U.S. 214 (2002), a petition for post-conviction relief that is untimely is not pending for purposes of § 2254(d)(2).  "When a postconviction petition is untimely under state law state law, 'that is the end of the matter' for purposes of § 2254(d)(2)."  *Pace*, 544 U.S. at 414.

The answer in this case was filed January 16, 2004, well before the decisions in *Pace* and *Chavis*.  Accordingly, Petitioner's argument to the contrary notwithstanding, based on then existing circuit law, at the very least, the fact that it was untimely did not readily appear.  Under these circumstances, the Court cannot find that Respondent intelligently and deliberately waived the one-year limitation defense.

Respondent argues that under *Pace–Chavis*, the first habeas petition filed in the California Superior Court, more than six months after the conviction became final, was untimely and, therefore, was never "pending" within the context of § 2254(d)(2).  The Court agrees.  While the Court agrees with Petitioner that it could find that the first petition was timely under controlling law, as it existed at the time the petition was filed, that is not the issue.  This Court must apply the law as it applies at the time it renders its decision unless so doing would work a manifest injustice.  *See Bradley v. School Bd. of City of Richmond,* 416 U.S. 696, 711 (1974).  In this case the change in the controlling law was the result of decisions by the Supreme Court construing § 2254(d)(2).  "[W]hen [the Supreme] Court construes a statute, it is explaining its understanding of what the  statute has meant continuously since the date when it became law."  *Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 313 n. 12 (1994).  *See also Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 90 (1993) ("[W]e hold that this Court's application of a rule of

federal law to the parties before the Court requires every court to give retroactive effect to that decision.").

There was a delay of more than 10 months between the time that Petitioner's habeas petition to the California Superior Court was denied and his subsequent petition presented to the California Court of Appeal and another delay of over a year between the time his petition was denied by the California Court of Appeal and the time he presented his first round petition for habeas relief to the California Supreme Court. Even if the first petition filed in the Sacramento Superior Court was timely, neither of these times would be tolled. Although the time between the date a petition is denied by a lower court and review by a higher court is sought is normally included within the tolling period, *Safford*, 536 U.S. at 219–21; that holds true only if review is sought timely, *id*., at 222-23. In this case, as in *Chavis*, both the California Court of Appeal and the California Supreme Court denied the petitions presented to those courts without opinion or citation to authority. Consequently, this Court must independently determine whether under California law those petitions were timely. *Chavis*, 546 U.S. at ___ [126 S.Ct. at 852]. As noted above, the Supreme Court made clear in *Chavis* that California would not consider an unjustified or unexplained six-month delay reasonable. Thus, the limitation period was not tolled for the more than 22 months that elapsed between the time the California Superior Court denied the petition presented to that court and time he filed his petition with the California Supreme Court. This time, standing alone, exceeds the one-year limitation of § 2254(d)(1).[6]

Petitioner attempts to escape the effect of this by asserting an actual innocence claim, essentially predicated upon his claim that the evidence was insufficient to sustain conviction. However, an actual innocence claim must be based upon "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). In addition, prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of the new evidence, "it is more likely than not that no reasonable juror would have found

---

[6] This eviscerates Petitioner's argument that the original petition filed in this Court on August 20, 2001, was timely. It was filed more than three years after Petitioner's conviction became final.

petitioner guilty beyond a reasonable doubt."  *Id.*, 513 U.S. at 327.  Petitioner presents no such additional credible evidence.[7/]

Neither the first petition filed in this Court on August 20, 2001, nor the current petition was timely filed.[8/]  Accordingly, the current petition must be dismissed as untimely.  Moreover, even if the Court were to consider the petition as having been timely filed, the result would not change.

## ADEQUATE INDEPENDENT STATE GROUNDS

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman v. Thompson,* 501 U.S. 722, 729 (1991).  This Court may not reach the merits of procedurally defaulted claims, that is, claims "in which the petitioner failed to follow applicable state procedural rules in raising the claims · · ·."  *Sawyer v. Whitley,* 505 U.S. 333, 338 (1992).  As discussed further in the section on the merits, the California Superior Court explicitly denied his petition on two grounds: untimeliness and as a successive petition.  As noted above, the first round petitions for habeas relief in the California

---

[7/] As in his first round petitions for habeas relief in the California Courts, the only new evidence submitted is the double hearsay affidavit of Petitioner's mother concerning potential juror bias (the mother was told by Petitioner's estranged wife that a cousin of the estranged wife told her she had overheard two jurors make statements that indicated racial bias).  In rejecting his "actual innocence" argument before it, the Sacramento Superior Court, applying the California counterpart to *Schlup,* held:

> Petitioner's second claim is that the judgment must be set aside because petitioner is factually innocent, which is shown by the record below's lack of sufficient evidence of his guilt.  The claim, however, does not involve newly discovered evidence.  Nor does it involve a claim of ineffective assistance of counsel.  Rather, petitioner desires for this court to go through the burdensome task of combing through the record to determine whether there was sufficient evidence to support the conviction.  That should not be a function of courts on habeas corpus.  Rather, this is an issue that should have been raised on appeal, when the record is properly before the reviewing court.  Neither the <u>Clark</u> nor the <u>Dixon/Waltreus</u> rules are meant to allow an exception for a claim of insufficiency of the evidence, merely because it could show "factual innocence" if the record did not establish sufficient evidence of guilt.  Rather, "factual innocence" should be shown by something additional, outside the record, that affirmatively establishes the petitioner's innocence.

[8/] This eviscerates Petitioner's equitable tolling argument to the extent that is based upon the failure of the Court to advise Petitioner concerning the "stay and abey" procedure as it was required to do under controlling circuit law at the time the original petition was filed.  Only if that petition were timely, which it was not, could that failure have had any possible prejudicial effect.

MEMORANDUM DECISION
*Manley v. Campbell,* 2:03-cv-00030-JKS                    9

Court of Appeal and California Supreme Court were untimely.  Under *Clark*, a successive or delayed petition for habeas relief will not be considered by California courts unless certain specified grounds are met.  By citing *Clark* in denying his second petition, the California Supreme Court explicitly signified that Petitioner had not established sufficient grounds to excuse his failure to file his second habeas petition timely.  Timeliness is an adequate independent state procedural ground precluding further review by this Court on a petition for relief under § 2254.  *Bennett v. Mueller*, 322 F.3d 573, 581 (9th Cir.2003).  In any event, even if the petition was timely and not procedurally barred, the result would not change.

DISCUSSION ON THE MERITS

Because Petitioner filed his petition after April 24, 1996, it is governed by the standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d).  Consequently, this Court cannot grant relief unless the decision of the California court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405–406 (2000); *see Lockyer v. Andrade,* 538 U.S. 63, 70-73 (2003) (explaining this standard).  In applying this standard, this Court reviews the last reasoned decision by the state court, *Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir.2004), which in this case was that of the California Superior Court, Sacramento County, on the state petition for habeas corpus.  In addition, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  When there is no reasoned state court decision denying an issue presented to the state court and raised in a federal habeas petition, this Court must assume that the state court decided all the issues presented to it and perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable.  *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir.2006); *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir.2005) (per curiam).

To the extent that Petitioner alleges errors of state law, they are beyond the purview of this Court in deciding a petition for federal habeas corpus relief.  This Court may only address violations of federal law. 28 U.S.C. § 2254(d); *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)

("We have stated many times that federal habeas corpus relief does not lie for errors of state law. Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.") (Citations and internal quotation marks omitted)).

<u>Ground 1 (Juror Bias)</u>:  Petitioner couches this claim in two parts: (1) alleged statements by one or more jurors that although the evidence was insufficient to convict, petitioner was guilty because he was black and (2) the concerns of Juror Number 12 regarding contact between the petitioner and teenage students present in the courtroom.

In addressing the first point the Sacramento Superior Court held:

> Petitioner's first claim is regrading alleged jury bias that was known by or should have been known by petitioner at the time of trial.  This claim is barred under the <u>Clark</u> doctrine.  None of this is newly discovered evidence that could not have been discovered at the time of trial with due diligence.  Thus, to get past the <u>Clark</u> bar, petitioner must show a fundamental miscarriage of justice.  He cannot.  The only related form of fundamental miscarriage of justice would be to show an error of constitutional magnitude that led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner.  Petitioner might be able to show that juror bias was fundamentally unfair, however he cannot show that absent the juror bias no other reasonable trier of fact would have convicted him.  Thus, he fails to show fundamental miscarriage of justice.
>
> Even if mere fundamental unfairness were all that were necessary, petitioner still fails to make such a showing.  The only possible instance of such fundamental unfairness would be from the petitioner's cousin's alleged overhearing two jurors tell each other that the evidence was insufficient but that petitioner was guilty because he was black.  However, petitioner fails to document this allegation with proper attachments.  All he offers is the hearsay statement of petitioner's mother, who recounts only what she was told by the cousin.  Petitioner does not submit an affidavit from the cousin herself, recounting what occurred.  Thus, the allegation is an empty one (<u>see In re Harris, supra</u>, 5 Cal.4th 813, 827 fn. 5 [habeas corpus petition must be supported by sufficient documentary evidence or affidavits]).
>
> In addition to being barred in total by <u>Clark</u>, the claim is barred by <u>In re Dixon</u> (1953) 41 Cal.2d 756, reaffirmed in <u>In re Harris, supra</u>, with regard to the parts of the claim concerning trial court error in finding no juror bias on the record.  Petitioner offers no reason why any exception to the Dixon bar would apply.  Thus, petitioner's first claim is barred by both <u>Clark</u> and <u>Dixon</u>.

Although the Sacramento Superior Court denied the petition on adequate independent state procedural grounds, even if this Court were to reach the merits the result would not change.

There is simply no credible evidence in the record to support a finding of jury bias.  As noted above, all that Petitioner offers is the affidavit of his mother in which she stated:

> Patricia Santos, petitioner's estranged wife, informed me of the following: Dorothy Santos, the cousin of Patricia Santos, had been studying law in school at the time the trial was held.  One day while she was at the courthouse observing trials, she cam upon petitioner's trial.  She distinctly overheard two jurors tell each other that while the evidence was not sufficient to convict petitioner, they were convinced that he was guilty because he was a black man.

At no time in the long history of these proceedings has the affidavit or testimony of Dorothy Santos been presented to any court; nor, for that matter, does Petitioner assert that she can be produced.  Double hearsay is simply not credible evidence to establish the existence of jury bias or to even warrant further investigation by this Court.  The record before this Court indicates that counsel for Petitioner wanted to investigate a possible claim of juror misconduct and requested release of the personal information of the jurors who sat on the case.  The parties stipulated to a procedure to investigate the alleged juror misconduct.  The trial court adopted the stipulated procedure under which the court sent letters to the jurors including a questionnaire asking each juror if they were willing to talk and, if so, under what terms and conditions.  After return of the questionnaires, the court would contact counsel to discuss how to interview the jurors—at least those who were willing to talk.  The record does not show that any jurors were actually interviewed.  However, the record does show that on the date of sentencing, the trial court observed that counsel had interviewed jurors and, since no motion for a new trial had been filed, the court assumed there were no grounds for seeking a new trial.

Petitioner also requests an evidentiary hearing.  However, Petitioner fails to even present a *prima facie* case of jury bias based upon credible, admissible evidence.  Petitioner does not identify who might be called and the testimony that might be elicited; indeed, Petitioner acknowledges that Dorothy Santos cannot be located.[9/]  Without her direct testimony concerning what she overheard and some identifying characteristics of the jurors she allegedly overheard, the Court cannot order a fishing expedition that entails calling in all the jurors who served,

---

[9/] Although Petitioner requested the Sacramento Superior Court hold an evidentiary hearing and issue a subpoena compelling Ms. Santos to testify, at least inferentially inferring she is a reluctant witness, at no point does it appear that the whereabouts of Ms. Santos was known nor was any reason given for not presenting her testimony in the form of an affidavit if her whereabouts were known.

MEMORANDUM DECISION
*Manley v. Campbell*, 2:03-cv-00030-JKS                    12

assuming, of course, they could even be located.  As Respondent correctly argues, federal courts are reluctant to permit post-verdict interrogation of jurors lest they be subjected to harassment in an effort to find some evidence of jury misconduct.  The U.S. Supreme Court recognizes the common-law rule that prohibits the admission of juror testimony to impeach a jury verdict.  The exception to that rule is when the situation involves an external influence, *e.g.*, reading a newspaper account, comments by outsiders, bribery, or hearing of prejudicial evidence not admitted at the trial.  *See Tanner v. United States*, 583 U.S. 107, 117–18 (1987).  Those exceptions are simply not present in this case.

No Supreme Court decision has held that a trial court, under the circumstances present in this case, was required to do more than the court did in this case.  Based upon this record, the Court cannot find that the decision of the Sacramento Superior Court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Williams v. Taylor, supra*; *see Lockyer v. Andrade, supra*.

As to Juror Number 12, although it was presented to the Sacramento Superior Court in the habeas petition filed in that court, it was not addressed in the court's decision.  Accordingly, this Court must make an independent *de novo* review of the record to determine if the decision of the Sacramento Superior Court was objectively unreasonable.

The trial court conducted an *in camera* colloquy with counsel, defendant and Juror Number 12.

> THE COURT:  Miss Sage, how about having a seat over there on my sofa; would you?
>
> THE JUROR:  Thank you.
>
> THE COURT:  Good morning.
>
> We should establish for the record we're meeting in chambers with juror number twelve Laurie Sage.
>
> All counsel and defendant are present.
>
> And as I advised you, Miss Sage, following our conversation I would have to report that to the lawyers and - -
>
> THE JUROR:  Hm-hmm (affirmative).

THE COURT:  - - they may want to talk for the record in here just to make sure you can be fair and impartial in this case.

But before we ask you some questions the record should reflect that we're having this session because yesterday the bailiff reported to me that you had mentioned to him that you didn't think this was appropriate case for some high school age children who were in the audience and, number two, you had observed the defendant talking with some of them and you felt that that perhaps was inappropriate given their age and the circumstances of this case - -

THE JUROR:  (Juror nodding head affirmatively.)

THE COURT:  - - as well.

Is that essentially what you told the bailiff?

THE JUROR:  I told him that that had initially struck me as -- a questioned teacher's judgment because of the explicit nature of some of the testimony, that it surprised me that this was his choice to have his students observe.

THE COURT:  Hm-hmm (affirmative).

THE JUROR:  I asked -- I don't remember my exact words.

I said is it customary to have students.

And I remember Skip saying we certainly wouldn't have sixth graders here. But, you know, the older students, yes - - that it was not so unusual to have them observe.

That was my first concern.

And then I did yesterday afternoon observe Mr. Manley talking to some of the students.  The conversation was innocent - - asking where he goes to school. It was just a - - a friendly thing.

I didn't feel that there was any - - I don't feel that I heard anything that I shouldn't hear as - - as a juror.

But again my concern for the students came up like it just -- it just didn't sit right with me.

I recognize that I am probably idealistic and my experience might not be the experience that these students have in school. But also I couldn't not say anything.

So that was - - that is how I see the issue.

THE COURT:  Then for the record this morning I asked you to step in for a few minutes to confirm that you'd had that conversation with the bailiff and you indicated that you had.

MEMORANDUM DECISION
*Manley v. Campbell*, 2:03-cv-00030-JKS                    14

Right?

THE JUROR:  Correct.

THE COURT:  All right.

The - - the concern, if any, of course is not so much with the propriety of the teacher's decision, but with your state of mind.

And - -

THE JUROR:  Hm-hmm (affirmative).

THE COURT:  - - we want to make sure that there is nothing about any of this that has affected you in terms of your job in this case, which is to listen to all of this evidence fairly and impartially, not make up your mind until you've heard it all, until you've heard the instructions, until you've heard the arguments of the lawyers and the viewpoints of your fellow jurors, and of course not to - - to be become biased against the defendant because of any of this.

THE JUROR:  Hm-hmm (affirmative).

THE COURT:  How do you feel presently?

THE JUROR:  I personally do not feel that it biases me.

I have been taking notes. I have - - feel that - - and I feel strongly in innocent until proven guilty.

I feel that the prosecutor has to make a very strong case that it is indeed Mr. Manley who was there.  But until that point it is -- he is innocent.  I firmly believe that.

This is the first time I'm sitting on a jury.  And the same concern that I have for the students I think I have for the judicial process that, you know, these – the rights - - that Mr. Manley has rights that I have.  I'm very glad I have them. And I need to extend them to him.

So if I was in his case - - in his situation being accused of something serious I would want to have the rights of innocent until proven guilty up to me - - I would want them to - - need to extend them to him.

THE COURT:  And are you saying in a nutshell then that nothing about any of this has given you any pause for concern about your impartiality?

THE JUROR:  No.

I think it is merely a sadness maybe on my part about the student's situation.

But, no, I don't think - - I feel that I can be - - remain to be impartial.

THE COURT:  Mr. Rose, do you have any questions?

MR. ROSE:  NO.

THE COURT:  Mr. Morris.

MR. MORRIS:  May I?

Just a couple.

THE COURT:  Certainly.

MR. MORRIS:  Could you tell us a little bit more about maybe what the contact was that you observed between Mr. Manley and the students.

Was it here in the courthouse? Out on the mall?

THE JUROR:  It was right here in the hall.

I believe it was yesterday afternoon.

And the - - some of the female students I believe -- actually they had initiated the conversation to be honest with you. And they'd said - - asked him, Mr. Manley, where he went to school.  And he answered and seemed very friendly and appropriate.

And that - - I believe there were four girls there, and it was, you know, there was some laughing and light-heartedness.

But the only thing I remember is, you know, questioning the - - where did you go to school, that kind of stuff.

And they -- I think he asked them were you guys sisters or friends, that kind of stuff.

That's - - the nature of what I - - I'd heard.

MR. MORRIS:  The concerns you have - - that I think you have - - do they relate in any way to any feelings that perhaps Mr. Manley because of the nature of the charges should not be out on bail for example and at liberty at the present time?

And so that is the - - part of the concern; is it?

THE JUROR:  I'd have to give that some thought.

I don't know if that's a subconscious thing that I - - I can't articulate that - - I think I'd be lying if I said, no, that might not be some undercurrent of how I feel.

Yet like I say the nature of the conversations appeared innocent enough.

So - -

MR. MORRIS:  The undercurrent as you described it -- is -- that at the present time something that I - - I take it is something you don't feel comfortable with?

THE JUROR:  I feel I could put that to the side.

I have to say I'm - - I'm glad I brought it up because it - - I feel that I'm being true to my feelings

MR. MORRIS:  Okay.

THE JUROR:  However, I'm beginning to see that really might not be germane to the trial at all.

It was just a - - a - - a side - - a - - a observation that I made.

But - - I don't know if I can convince of -- that I'm not going to be biased. But I feel that I am able to put aside stuff and do my job of just looking at the evidence.

THE COURT:  Miss Sage, except in capital murder kinds of cases everyone charged with a crime is entitled to reasonable bail.

And it's - -

THE JUROR:  Hm-hmm (affirmative).

THE COURT:  - - it's standard operating procedure in all cases to set bail and for people charged with a crime to be out on bail.

Is there anything about that - - the fact the defendant is out on bail - - as counsel has said not in custody pending the trial of the case -- that is causing you any discomfort?

THE JUROR:  No. No.

That's not it at all.

I mean there is wiser people that decide - - that set the bail.

That is not my place.

THE COURT:  Your first -- your concern was more with respect to - - to the - -

THE JUROR:  I think it was the propriety of the testimony and then the talking.  You know, the - - they had just heard the testimony and the - -

THE COURT:  These children being here at all - - the wisdom of - -

THE JUROR:  Hm-hmm (affirmative).

THE COURT:  All right.  Anything else?

MR. MORRIS:  No.

THE COURT:  All right. Why don't you go out in the hallway?

And we'll be out in a few minutes.

THE JUROR:  Thank you.

THE COURT:  Thank you for being so open with us.

THE JUROR:  And I'm -- I appreciate you giving me a audience.

(Whereupon the juror left the chambers.)

THE COURT:  Okay. What does everybody think?

MR. MORRIS:  I would ask that she be excused.  I recognize that she has indicated that she can be fair and impartial and set various things aside.

But I think she was very open when she indicated that - - I mean she does have certain concerns.

And I - - they focus primarily on the fact that -- I mean he is out of custody.  This is a undercurrent she describes.

I mean this is this danger on his part, which is contrary to certain - - the presumption of innocence.

And that's a internal struggle that she is having.

And - - and in spite of her protestations to the opposite I'm asking this court to excuse her as a juror.

MR. ROSE:  I disagree.

There's -- she didn't talk about dangerousness or anything except that she finds that some of the things that are going on are a little bizarre - - inappropriate in her mind.

The only - - you know, I agree with her. I mean to have - - you know, if -- we just saw school children in there. I know I wouldn't have wanted my daughter who at the time is 16 to sit in and listen to this type of testimony.

And not knowing where these kids are from or their background or anything else there is probably a lot of people that might question the wisdom.

And then to link to this type of testimony that deals with a brutal sexual assault, sodomy, and everything else on a stranger, one of the most heinous acts, and then to see the defendant kind of sitting in the hallway chatting with people that she finds -- might look on as being young and impressionable - - these - - that's got to be a little bit - - I think a - - a little strange - - you know, a little bizarre.

But to then to take the next step - - to override her honesty when she is saying she can set it aside - - you know, that - - she hasn't said anything that would indicate she can't be fair.

MR. MORRIS:  I'm not suggesting that she is not telling the truth and deliberately trying to create a falsehood.

What I'm saying is that in spite of what she says - - I mean there is a inclination that is unfairly giving the prosecutor an advantage here.  And accordingly that's sufficient.

THE COURT: I think her concern is that she thinks it's odd that school age children should be in a position not only to observe this kind of a trial, but to talk to someone who is accused of this conduct.

I think it ends right there.

I believe she is being absolutely honest and earnest when she says that doesn't affect her view of this case or of the defendant. She presumes him innocent and will give him a fair trial.

So I'm going to overrule the motion to excuse her.

Petitioner does not argue that the process utilized by the trial court violated due process. The U.S. Supreme Court has held that the "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record." *Wainwright v. Witt*, 469 U.S. 412, 429 (1985).  Consequently, in federal habeas cases the decision of the trial court must be "presumed correct" unless Petitioner rebuts the presumption by clear and convincing evidence.  *Witt*, 469 U.S. at 431; 28 U.S.C. § 2254(e)(1).  This, Petitioner has failed to do.

Petitioner is not entitled to relief on his first ground.

Ground 2 (Inherently incredible evidence):  Although it denied the analogous claim presented to it on adequate independent state procedural grounds, the Sacramento Superior Court further held:

In any event, even if this court were to consider petitioner's second claim on the merits, it would be rejected.  That the victim was unable to identify petitioner was due to the perpetrator's covering of her head and blindfolding her during the incident; this was not a case in which the victim had a clear view of the perpetrator but thereafter could not identify the defendant as him or her. Petitioner's claim that the victim described her assailant as being circumcised is incorrect, as the police report on which petitioner relies, which is not evidence, reflects only that the victim stated that she did not even know if the assailant was

circumcised although she thought he was but was not sure.  That the flashlight containing petitioner's fingerprints was found in a flowerbed outside the victim's condominium could have found its way there in a myriad of ways does not preclude a reasonable jury from finding that that connected petitioner to the crimes.  That the shoes found and exhibited to the jury were petitioner's brother's and not petitioner's does not preclude a jury from having found him guilty based on other evidence.  That the prosecution surmised that the perpetrator had entered the victim's apartment through a small window in the back of the apartment, where a stacked washer/dryer stood, did not prevent the parties from arguing the point at trial and the jury from making any reasonable inferences about the difficulty a person would have in entering the premises through that particular window; nor did it refute that entry had been made in some way.  That the victim was diagnosed with genital herpes after the attack, while petitioner has been tested numerous times for herpes with negative results, did not exclude petitioner as the perpetrator; contrary to petitioner's assertion, the police report, which again was not evidence, stated only that the victim reported that she had come down with vaginal herpes and was being treated for it, and had not had an outbreak in the past five years, and did not establish that she did not have herpes before the offenses were committed.  Finally, that the victim told officers she had no reason to question the perpetrator's assumption that he was 25 years old, when he was only 16 at the time, was of no consequence, as the victim had her head covered and had been blindfolded; further, many teenagers have the appearance of young adults and vice versa.  Since none of petitioner's assertions discredited the sufficiency of the evidence, this claim would have been denied, had this court reached its merits.

The constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original).   Assuming for the purposes of this discussion, the California Court of Appeal and California Supreme Court in denying review adopted the decision of the Sacramento Superior Court, this court must determine whether the decisions by the California courts on the merits unreasonably applied *Jackson*.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.  *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must undertake its inquiry by reference to the elements of the crime as set forth in state law.  *Jackson*, 443 U.S. at 324 n. 16.  This Court must also be ever mindful of the deference owed to the trier of fact and the sharply limited nature of constitutional sufficiency

review. *Juan H. v. Allen*, 406 F.3d 1262, 1275 (9th Cir.2005). The decision of the Sacramento Superior Court clearly held that the evidence was sufficient to sustain Petitioner's conviction of the crimes *under California law*, as interpreted and applied by it. Whether the Sacramento Superior Court correctly applied California law is beyond the purview of this Court in a federal habeas proceeding.

Petitioner misperceives the role of a federal court in a habeas proceeding challenging a state-court conviction. This Court is precluded from either re-weighing the evidence or assessing the credibility of witnesses. Under *Jackson*, the role of this Court is to simply determine whether there is any evidence, if accepted as credible by the jury, sufficient to sustain conviction of the crime with which a petitioner is charged, as determined by state law. Petitioner bears the burden of establishing by clear and convincing evidence that the factual findings of the jury were erroneous. 28 U.S.C. § 2254(e)(1). A burden Petitioner has failed to carry.

This Court cannot say that the decision of the Sacramento Superior Court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Nor can this Court find that the Sacramento Superior Court unreasonably applied the correct legal principle to the facts of the prisoner's case as required by *Lockyer–Williams*; *i.e.*, the state court decision was more than incorrect or erroneous, its application of clearly established law was objectively unreasonable.

Petitioner is not entitled to relief on his second ground.

Ground 3 (Insufficiency of the evidence to convict on kidnaping): In denying this claim, the Sacramento Superior Court held:

> Petitioner's third claim is that the kidnapping [*sic*] did not involve sufficient movement of the victim for purposes of establishing kidnap or kidnap for robbery as a matter of law, and that trial counsel was ineffective for failing to raise this issue. Because petitioner has also cast this claim in ineffective assistance of counsel terms, an exception to the Dixon bar applies. However, the Clark bar is a different matter. Because the claim involves a legal issue of whether asportation was not present as a matter of law, without which petitioner could not have been convicted of kidnap or kidnap for robbery, it could be viewed as a claim of factual innocence, to which an exception to the Clark bar arguably also applies. However, as noted above, something additional is probably required

before the factual innocence exception of <u>Clark</u> may apply.  Petitioner is not disputing, for purposes of this claim, that he was the person who forced the victim from her condominium out onto the carport and to her car, thus he does not claim that he did not in fact commit the asportation.  Rather, his claim is based only on a lack of asportation itself, a legal question that could have been raised in his first habeas petition but was not.  Thus, it is unlikely that any <u>Clark</u> exception was meant to apply to this type of claim.  The claim, therefore, is barred by <u>Clark</u>.

In any event, even if the court were to reach the merits of this third claim, it would be denied. In this case, the perpetrator had entered the victim's apartment and committed various sexual offenses on her.  Toward the end of the ordeal, the perpetrator told her they would need to go to an automatic teller machine to get money, and that he knew she drove a red car.  He then made her walk out of her condominium to the carport area to where she had parked her car, about 50 feet away.  She told him the car had an alarm, however, and he walked her back to the condominium, then put her in a closet and left.  Under <u>People v. Daniels </u>(1969) 71 Cal.2d 1119, for purposes of kidnap for robbery, the movement of the victim must be beyond that merely incidental to the commission of the underlying offense, and there must be an increase in the risk of harm to the victim over and above that necessary present in the underlying offense.  The jury is to consider the scope and nature of the movement, including its actual distance and the context of the environment in which the movement occurred.  In this case, the victim was moved from her condominium to her car in the carport, with ,the intention at the time of the movement that the victim be taken in the car to an automatic teller machine at a bank so that she could withdraw money to give to the perpetrator.  This is not a case in which a search of a residence for money is continued to the parking lot so that a search of the victim's car for money, as well, could take place.  Further, the increase in risk of harm also was apparent, had the perpetrator not been told that the car had an alarm, as he otherwise would have placed the victim in the car and taken off.  Under these circumstances, then, it was a factual question for the jury as to whether asportation had occurred.  Asportation, under these facts, was not precluded as a matter of law.  The claim, therefore, would be denied on the merits, if this court were to reach them.

The reasoning of this Court with respect to the second ground applies with equal force to the third and in the interests of brevity will not be repeated here.  Suffice it to say that, as with the second ground,  the decision of the Sacramento Superior Court clearly held that the evidence was sufficient to sustain the conviction of the crimes *under California law*, as interpreted and applied by it.

This Court cannot say that the decision of the Sacramento Superior Court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the

MEMORANDUM DECISION
*Manley v. Campbell*, 2:03-cv-00030-JKS                            22

facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Nor can this Court find that the Sacramento Superior Court unreasonably applied the correct legal principle to the facts of the prisoner's case as required by *Lockyer–Williams*; *i.e.*, the state court decision was more than incorrect or erroneous, its application of clearly established law was objectively unreasonable.

Petitioner is not entitled to relief on his third ground.

Ground 4 (Inadequate Jury Instruction): The jury requested additional clarification: "Can any guidelines be given on what slight, brief, or trivial is? Regarding Distance?" In response the court stated:

> There are no hard and fast rules on what is substantial versus a slight, brief, or trivial distance. It cannot be defined in terms of a specific number of inches, feet or miles. It is a question of fact for you the jury to decide, along with the other factors required for that offense. See Instruct. 32.

Instruction 32 provided in relevant part: "The movement of such person was for a substantial distance, that is a distance more than slight, brief or trivial." Both the instruction and the response of the court were accurate under California law. *See People v. Daniels*, 459 P.2d 225, 238 (Cal.1969).

In rejecting this claim, the Sacramento Superior Court held:

> Petitioner's fourth claim is that the trial court erred in answering the jury's question about what constituted substantial movement, and both trial and appellate counsel were ineffective in failing to raise this issue. Because petitioner has also cast this claim in ineffective assistance of counsel terms, an exception to the Dixon bar applies. However, petitioner does not establish any exception to the Clark bar of this claim. It does not involve an error of fundamental magnitude that led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner. Nor does it involve factual innocence, as discussed above; indeed, this claim is even more attenuated from factual innocence than petitioner's third claim, discussed above. Therefore, the claim is denied as barred under Clark.

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California,* 494 U.S. 370, 380 (1990). The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471

U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions.  *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Francis v. Franklin*, 471 U.S. at 324 n. 9.  It is well established that not only must the challenged instruction be erroneous but it must violate some constitutional right and may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  *Estelle v. McGuire*, 502 U.S. at 72.  This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" very narrowly.  *Id.*, 502 U.S. at 72–73.  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation."  *Id.*

Petitioner's argument contains three fundamental flaws: (1) other than a broad reference to the Fifth, Sixth, and Fourteenth Amendments, he has failed to identify which specific constitutional right has been violated and specify how that right has been violated;  (2) at no time has he elucidated what clarifying instruction should have been given; and (3) he has not argued, let alone established, that the instruction given to which the jury's question pertained and the court's response to the question did not accurately state California law.  All Petitioner contends is that the question indicated the jury sought more advice concerning the instruction it was given but does not suggest what, in addition to the court's response, the jury should have been told.  The argument that "the court's answer was tantamount to a direction that the movement of the victim in the instant case sufficiently established the asportation requirement for a kidnaping for robbery conviction" falls wide of the mark.  As the Sacramento Superior Court opined, the facts of the case did not preclude a finding of asportation as a matter of law.  Whether the asportation requirement was met was a question of fact for the jury to determine.  The response in this case was entirely consistent with California law as interpreted and applied by its Supreme Court.[10]  Where the initial instruction accurately states applicable law, as Petitioner at least inferentially concedes, it is not error to refer the jury to the original instructions.  *See Arizona v. Johnson*, 351

---

[10] Even if it was not, as discussed above, that question would be a question of state law beyond the purview of this Court.

F.3d 988, 993–94 (9th Cir.2003).  Thus, there can be no prejudicial error for the failure to provide additional guidance.  *See Beardslee v. Woodford*, 358 F.3d 560, 575 (9th Cir.2004).

No decision of the Supreme Court of the United States has held that a court must instruct the jury on the meaning of  non-technical words or phrases.  This Court cannot say that the decision of the Sacramento Superior Court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Nor can this Court find that the Sacramento Superior Court unreasonably applied the correct legal principle to the facts of the prisoner's case as required by *Lockyer–Williams*; *i.e.*, the state court decision was more than incorrect or erroneous, its application of clearly established law was objectively unreasonable.

Petitioner is not entitled to relief on his fourth ground.

Ground 5 (Ineffective assistance of counsel):  Petitioner claims four errors of trial counsel that rendered his representation inadequate:

(a)      failing to have the jury question regarding the distance required to satisfy the asportation element kidnaping adequately answered;

(b)      failing to present exculpatory evidence that victim had contracted genital herpes as a result of the sexual assault and Petitioner did not have genital herpes;

(c)      failing to request a continuance to investigate new evidence introduced at trial; and

(d)      failing to investigate and present available evidence corroborating Petitioner's alibi defense.

The Sacramento Superior Court in rejecting this claim held:

Petitioner's fifth claim is of ineffective assistance of his trial counsel, in failing to investigate and present evidence that petitioner did not have genital herpes; that petitioner was with his mother at the time of the crimes; that petitioner could not enter the apartment as the prosecution alleged.  Also, petitioner claims ineffective assistance of counsel in failing to request that petitioner be subjected to a voice lineup, and failing to request a continuance when DNA tests of petitioner's brother came up negative.

Because petitioner has also cast this claim in ineffective assistance of counsel terms, an exception to the <u>Dixon</u> bar applies. However, petitioner does not establish any exception to the <u>Clark</u> bar of this claim. It does not involve an error of fundamental magnitude that led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner. Nor does it present any viable claim of factual innocence. As discussed above, that petitioner did not have genital herpes does not establish a fundamentally unfair trial or petitioner's innocence under the meaning of <u>Clark</u>. Petitioner has failed to attach any documentation that the victim could not possibly have had genital herpes at any time before the offenses in this case took place. Nor does alibi testimony that trial counsel failed to elicit establish that the trial was fundamentally unfair or that petitioner was innocent under the meaning of <u>Clark</u>. Circumstantial evidence connected petitioner to the case, including compelling DNA evidence. That petitioner could not have entered the apartment as alleged does not establish that petitioner did not in fact enter the apartment and commit the crimes. Again, this does not establish either a fundamentally unfair trial or petitioner's innocence under the meaning of <u>Clark</u>. Finally, petitioner does not allege what a voice lineup of him would have revealed, or what a continuance would have led to, the lack of which would have established either a fundamentally unfair trial or petitioner's innocence, under the meaning of <u>Clark</u>. Thus, petitioner's fifth claim is denied as barred under <u>Clark</u>.

Although the Sacramento Superior Court decided the issue on adequate independent procedural grounds, even if the merits were to be reached, Petitioner cannot prevail. To demonstrate ineffective assistance of counsel, Petitioner must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). A deficient performance is one in which counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. *Id.* Petitioner must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *Hill v. Lockhart,* 474 U.S. 52, 57 (1985). Indeed, the Supreme Court admonished in *Strickland*, 466 U.S. at 689 (internal citations and quotation marks omitted):

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to

reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.

On his first claim, failure to require an appropriate answer to the jury's question, since, as discussed under the fourth ground there was no error, counsel's performance could not be deficient.  Thus, the first prong of *Strickland* is not met.

On his second claim, failure to introduce evidence that Petitioner did not have genital herpes, there was no evidence presented to the jury that the victim was infected with genital herpes or that she contracted it from Petitioner.[11/]  Petitioner argues that evidence indicating that the victim contracted herpes as a result of the assault and that Petitioner was tested and found not to be infected "likely would have resulted in a more favorable verdict, likely, complete acquittal."  Petitioner argues that assuming the victim contracted genital herpes as a result of the assault, as was indicated in the police report, and Petitioner was not so infected, would have proven he was not the perpetrator.

Counsel for Petitioner did, in fact, bring the facts concerning Petitioner's negative herpes tests to the attention of the trial court prior to sentencing.  The trial court, expressing serious misgivings about the reliability of the testing, nonetheless assumed that Petitioner was free of herpes for the purpose of imposing sentence.

As both Petitioner and Respondent point out, there is a dispute within the scientific community concerning the reliability of herpes tests.  In fact, Petitioner concedes that the older tests were unreliable but that the newer tests are more reliable.  One fundamental problem with Petitioner's argument is that the record does not reflect which tests were administered to

---

[11/] The "evidence" concerning the victim's contracting genital herpes was contained in a police report that was not introduced into evidence.  "[The victim] advised that she has come down with vaginal herpes from the suspect and is being treated for same now."  In the post-trial report of the probation officer's it was stated: "She [the victim] stated as a result of the of the offense, she contracted vaginal herpes for which there is no cure.  She must take medication when needed to control the condition."

MEMORANDUM DECISION
*Manley v. Campbell*, 2:03-cv-00030-JKS

Petitioner in 1995–1996.[12]  Contrary to Petitioner's arguments, even viewed in the light most favorable to Petitioner, introduction of the herpes evidence as argued by Petitioner would not necessarily have established that Petitioner was not the perpetrator.   It is just as likely that it would have established either that the victim was (1) mistaken as to when she contracted herpes or (2) being less than truthful about her sexual activity prior to the assault.[13]  Or, viewed in the light most favorable to the prosecution, the jury could have rejected the evidence that Petitioner was not infected with herpes.  In that case, the evidence of guilt would have been even more damning.  The long and short of it is that Petitioner has failed to overcome the strong presumption that, based upon the information available to him at the time of trial, counsel's failure to pursue the genital herpes issue was sound trial strategy.

Even assuming counsel's performance was deficient and the genital herpes evidence had been introduced at trial, given the other evidence, including, as discussed below, the properly admitted DNA evidence, there is simply no reasonable probability that a different result would have been reached.  Thus, the second prong of the *Strickland–Hill* test has not been satisfied.

Petitioner also faults trial counsel for failure to request a voice line-up and present evidence of Petitioner's speech impediment.  The conclusory statement that showing that Petitioner "spoke with a pronounced stutter or stammer, whether through an expert, family member or a teacher would have assisted petitioner at trial," is insufficient.  Petitioner does not allege, let alone introduce any evidence of, the extent of the speech impediment or the conditions under which it presented itself.  Petitioner's argument is based upon surmise and speculation, not evidence.  Petitioner has failed to satisfy the *Strickland–Hill* test.

On his third claim, that trial counsel failed to request a continuance to investigate the new evidence that exonerated Petitioner's brother as the perpetrator, Petitioner has failed to even remotely suggest what such an investigation might have revealed or how it would have impacted the defense.  Petitioner's conclusory statement that "[h]ad trial counsel done this, he would have

---

[12] As an Exhibit Petitioner submitted a copy of Serology Test Results taken in April 1998 in which Petitioner tested negative: "No evidence of immunity or previous infection."

[13] The victim testified that she had not had consensual intercourse "in a couple of years."  As the Sacramento Superior Court noted, there is no evidence that the victim was not infected with genital herpes prior to the 1995 attack.

MEMORANDUM DECISION
*Manley v. Campbell*, 2:03-cv-00030-JKS

been able to re-evaluate his strategy and present a stronger and more directed defense on behalf of petitioner which would have resulted in a more favorable verdict," is utterly devoid of any evidentiary basis.  Moreover, Petitioner does not identify what that "stronger and more directed defense" might have been, nor has he established that the trial court would have granted him such a continuance.  Again, Petitioner has failed to meet the *Strickland–Hill* test.

Turning to his fourth claim, failing to investigate and present corroborative evidence of Petitioner's alibi defense, Petitioner equivocates on the factual basis for this claim.  In his petition it is alleged that "[h]ad trial counsel investigated this information, he would have been able to present a stronger alibi case and petitioner would have obtained a more favorable result." In his traverse, Petitioner shifts his position: "When trial counsel went to interview the witness during the course of the trial, her memory had faded and she was no longer able to remember the night of the offense.  Had counsel interviewed her when he was initially provided with the information, she would have remembered seeing petitioner and his mother outside the condominium at or around 3:00 o'clock in the morning."

Petitioner does not tell us when trial counsel was first informed of the witness; accordingly the Court cannot determine the extent of the time that lapsed between the time counsel was advised of the identity of the alibi witness and the time he interviewed her.[14/]  A review of the record indicates that trial counsel did not make an appearance in this case until sometime in July 1993.  More importantly is the fact that it is unexplained how, if in fact, the witness' memory had faded by the time of trial, she could have testified to the facts to which Petitioner claims she could have testified.  In the absence of evidence to the contrary, the Court must assume that trial counsel attempted, without success, to refresh the witness' memory; indeed, Petitioner does not present any evidence to the contrary.  In that case, the witness could not have provided any testimony at the time of trial that would possibly have bolstered Petitioner's alibi defense.  As with the other claims, Petitioner has failed to satisfy *Stricklan*d–*Hill*.

---

[14/] The Court notes that more than three years lapsed between the incident, July 1992, and the defense case-in-chief in late September 1995.

MEMORANDUM DECISION
*Manley v. Campbell*, 2:03-cv-00030-JKS

This Court cannot say that the decision of the Sacramento Superior Court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  Nor can this Court find that the Sacramento Superior Court unreasonably applied the correct legal principle to the facts of the prisoner's case as required by *Lockyer–Williams*; *i.e.*, the state court decision was more than incorrect or erroneous, its application of clearly established law was objectively unreasonable.

Petitioner is not entitled to relief on his fifth ground.

Ground 6 (Use of "floating bin method"):   Petitioner argues that the DNA test used in this case was inherently unreliable under the subsequent decision of the California Supreme Court decision in *People v. Venegas*, 954 P.2d 525 (Cal.1998).  So stated this is a claim under California law which is not cognizable in federal habeas corpus. *Estelle v. McGuire, supra*.  It is only if Petitioner is arguing that the defects in the processing of the DNA made the expert's testimony inadmissible under Federal law and if excluded would have left the remaining evidence insufficient to permit a jury to find him guilty beyond reasonable doubt that Petitioner would state a federal claim.  The claim will be considered in this way.  In order to understand the impact of *Venegas* on federal law we must first briefly consider the evolution of the standards governing the admissibility of expert testimony based upon "novel" scientific techniques and procedures.

In 1923 the D.C. Circuit Court of Appeals confronted an ancestor of the lie detector test. In resolving challenges to the admissibility of evidence regarding such a test the court adopted a general rule covering all evidence based upon novel scientific theories and processes.  *See Frye v. United States*, 293 F. 1013, 1014 ( D.C. Cir.1923).  In due course the *Frye* test became the prevailing rule in the federal courts for resolving disputes over expert evidence purporting to report the results of scientific tests and procedures.  Many states also incorporated the *Frye* test into their jurisprudence.  California was one such state.  *See Huntingdon v. Crowley*, 414 P.2d 382 (Cal.1966) (blood tests).  Later the California Supreme Court summarized its understanding of *Frye* and determined how it would be applied in *People v. Kelley*, 549 P.2d 1240 (Cal.1976). Thereafter the California courts referred to the California test as the *Kelley-Frye* test.  It has three

parts: The first prong requires that the reliability of a new scientific technique be established by showing that the technique has gained general acceptance in the particular field to which it belongs; the second prong requires that any witness testifying on general acceptance be properly qualified as an expert on the subject; and the third prong requires that the proponent of the evidence must demonstrate that correct scientific procedures were used in the particular case. *Kelley*, 549 P.2d at 1240.

With the adoption of the Federal Rules of Evidence in 1975 the question arose whether *Frye* was still good law in the federal system. This question was decided by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Kumho Tire Co. Ltd v. Carmichael*, 526 U.S. 137 (1999); *General Electric Co. v. Joiner*, 522 U.S. 136 (1997). *Daubert* rejected *Frye* and concluded that: (1) "general acceptance" is not a necessary precondition to admissibility of scientific evidence under the Federal Rules of Evidence, and (2) the Federal Rules of Evidence assign to the trial judge the task of ensuring that an expert's testimony both rests upon a reliable foundation and is relevant to the task at hand.

The state courts that had adopted *Frye* began their own reconsideration post-*Daubert.* Many followed *Daubert* in rejecting *Frye*. California did not. *People v. Leahy*, 882 P.2d 321 (Cal.1994). In *Leahy* the Supreme Court of California considered the more flexible standard adopted in *Daubert* and rejected it preferring to continue with the *Kelley-Frye* rule. Given the demise of *Frye* the California rule was rechristened the *Kelley* rule. Thus post-*Leahy* California law diverges from Federal law on the admissibility of novel scientific evidence and this distinction is fatal to Petitioner's challenge to the DNA evidence introduced in his case.

In order to demonstrate this it is necessary to look at the state of DNA evidence in 1995 when Petitioner was tried and bring it up to date. In so doing this court will look only to matters significant to this case. The various methods for sampling DNA at crime scenes, obtaining DNA samples from criminal defendants and then examining the DNA to either exclude or include the defendant within the population of those who might have produced the DNA found at the crime scene and then if, but only if there is a match between the crime scene sample and the defendant's DNA, go on to determine statistically the number of other people who could also satisfy a match, *i.e.,* share the relevant DNA results has been exhaustively evaluated in the case law and scientific literature. For our purposes it is best to focus on California law and note that

the California cases recognized two laboratories that performed DNA analysis in 1995.  The FBI in Washington DC and Cellmark in Maryland.[15/]  Generally *Kelley* required a pre-trial evidentiary hearing to validate a novel scientific procedure but eliminated this step where a court had in a decision entitled to precedential value validated the scientific procedure.  In *People v. Axell*, 1 Cal. Rptr.2d 411 (Cal.App.1992) the court validated Cellmark's procedures.  In *People v. Barney,* 10 Cal. Rptr.2d 731 (Cal.App.1992) the court considered both Cellmark and the FBI protocols and concluded that advances in scientific research had established a controversy that had not existed at the time *Axell* had been decided, depriving it of precedential value as to the third prong of the *Kelley-Frye* test.  The court went on to hold that statistical evaluation of a match was flawed under both protocols rendering the DNA evidence inadmissible but concluded that in each case its admission was harmless.  In short, *Barney* rejected DNA matching evidence on two interrelated grounds: 1) the dispute in the scientific community precluded a finding of general acceptance of the statistical procedures used to prove identity between the DNA found at the crime scene and the defendant thus failing the first prong of the *Kelley* test and 2) the record failed to establish the third prong of the *Kelley* test that the procedures had been correctly followed in the case before the court *i.e.* that the results were questionable.  Thereafter various decisions noted the differences between *Axell* and *Barney*; some cases followed *Axell* and some *Barney*.  The California Supreme Court resolved the dispute in *People v. Venegas,* 954 P.2d 525 (Cal.1998) and *People v. Soto*, 981 P.2d 958 (Cal.1999).  Essentially, the court reinstated *Axell* and rejected *Barney*.  Under Current California law the admissibility under the first prong of the *Kelly* test of RFLP DNA profiling  including the unmodified product rule and the ceiling rules has been determined.  It is no longer necessary to address these issues in a *Kelley* hearing.  All that remains is whether in a particular case the testifying experts have been qualified (prong 2)

---

[15/] Cellmark did the DNA work in this case.  It should be noted that the court in *Venegas* considered only the FBI procedures not Cellmark's procedures.  Further, in rejecting as harmless error, the Court declined to consider the evidence regarding the unmodified product rule because the court had not had the opportunity to study it.  Subsequently, the court approved the unmodified product rule in *People v. Soto*, 981 P.2d 958 (Cal.1999).  Thus any error in applying the "ceiling rule" in this case would have been cured by the evidence introduced regarding the unmodified product rule.  Ironically, this result would be the opposite of the approach taken by the California Court of Appeal, which ruled prior to the decisions in *Venegas* and *Soto* and treated the evidence regarding  the "ceiling rule" as curing any error regarding the as yet unapproved "umodified product rule."

MEMORANDUM DECISION
*Manley v. Campbell*, 2:03-cv-00030-JKS

and whether the correct scientific procedures were used, *i.e.*, whether the result is reliable (prong 3).  The Supreme Court of California  has also concluded that expert testimony on DNA profiling frequencies for the three most common population groups ( Caucasian, Black and Hispanic) was admissible even in the absence of sufficient evidence of the perpetrator's ethnicity.  *See People v. Wilson*, 136 P.3d 864 (Cal.2006).[16/]

During this period the federal courts have not been quiet.  The admissibility of DNA profiling evidence including the statistical procedure  evidence necessary to identify the number of people in the relevant population who share a DNA profile with the defendant and the evidence at the crime scene  have been carefully considered.  *See e.g. United States v. Chischilly*, 30 F.3d 1144 (9th Cir.1994) (under *Daubert* the three chief components of RFLP DNA, profiling: 1) sample possessing, 2) match determination and 3) statistical analysis, pass muster).  *Cf. United States v. Wright*, 215 F.3d 1020 (9th Cir.2000) (recognizing prior approval of both RFLP and PCR methods of testing DNA); *U.S. v. Hicks*, 103 F.3d 837 (9th Cir.1996) (approving PCR method of testing DNA).  A comparison of federal law with California law indicates that the federal courts reject the first prong of the *Kelley* test substituting the more flexible test from *Daubert*.  The Federal test is in conformity with the second prong of the *Kelley* test.  There is no argument in this case that the experts who testified on behalf of the government were not qualified.  In some respects they were the same experts found qualified in earlier cases.  The focus of attention is therefore on the third prong of the *Kelley* test, the requirement that the procedures the lab intended to follow were in fact followed.  Petitioner's argument addresses this prong.  Under California law this is a question for the court.  In *Venegas* it was the third prong that resulted in exclusion of the evidence.  In contrast, in federal courts claims based upon the third prong go to the weight not the admissibility of the evidence and are for the jury not the court.[17/]  Petitioner has not cited a single case in which a federal court, let alone the United States

---

[16/] The victim thought that the perpetrator had an Afro-American accent but wasn't sure about his ethnicity.  The defendant is Afro-American. The approach taken in this case is consistent with *Wilson*.

[17/] The argument that third prong claims went only to weight was presented to the California Supreme Court in *Venegas* and rejected for reasons included in the opinion.  Thus federal law and California law diverge on this issue which is at the heart of Petitioner's claim in this court.  It should be noted that the court in *Chischilly* did note that the trial judge must perform the balancing required by FED. R. EVID. 403 even if evidence passes *Daubert* muster.  It noted two concerns: 1) that the jury will accept

Supreme Court, has found DNA evidence to fail the *Daubert* analysis.  Thus, no federal court has expressed the concerns identified by *Venegas* regarding its application of prong 3 of the *Kelley* test to such evidence.

In sum, Petitioner's claim that errors in DNA processing rendered DNA testimony inadmissible under California law was rejected by the California courts.  Even if those courts misapplied California law, as Petitioner contends, his claim is not cognizable in federal court.  Examining his contentions under the standards established in *Chischilly* his objections go to the weight of the evidence not its admissibility.  Since the evidence would have been admissible in a federal court its admission in state court cannot have violated Petitioner's federal constitutional rights.  Since the evidence was admissible it may be considered in determining whether there was sufficient evidence to permit a jury to find Petitioner guilty beyond reasonable doubt.  *See Jackson v. Virginia*, 443 U.S. 307 (1979)

Even if cognizable in this Court, Petitioner has not established a violation of *Venegas*.  Petitioner argues that the "floating bin" methodology used in this case is identical to the methodology rejected by the California Supreme Court in *Venegas*, *i.e.*, that the floating bins were too narrow.  As relevant to this case, the California Supreme Court held in *Venegas* [954 P.2d at 555]:

> The FBI's floating bin of plus or minus 2.5 percent was too narrow because, as Mueller pointed out, it failed to include all the band sizes within the FBI's actual match criterion.  As described by Lynch, that criterion requires not one but two match windows of plus or minus 2.5 percent, one around the band from the known (defendant's) sample and the other around the questioned evidentiary sample.  A match is declared if the windows overlap.  If the windows barely overlap, the distance between matched bands may be almost twice 2.5 percent, or

---

DNA evidence establishing a statistical probability of the number of people in the tested population who share the same DNA profile as the defendant and the source of the crime scene sample as the statistical probability that the defendant was the source of the DNA left at the crime scene (equating of random match probability with source probability:  the prosecutor's fallacy) and 2) that once the jury settles on a source probability, even if correctly, it will equate source with guilt ignoring the possibility of a non-criminal reason for the evidentiary link between the defendant and the victim.  Neither is present here.  The prosecutor's primary reliance on DNA evidence was to show that it excluded the brother and did not exclude the defendant.  Beyond that the prosecutor only spoke in passing of the statistical likelihood that someone else in the general population shared the defendant's DNA profile.  Here there was no reason independent of crime offered to explain the evidentiary link between the defendant and the victim.

MEMORANDUM DECISION
*Manley v. Campbell*, 2:03-cv-00030-JKS                    34

5 percent.   Thus, the floating bin should have been plus or minus 5 percent. (Accord, 1996 NRC Rep, supra, pp. 141 [fig. 5.2], 142-143.)[FN 41]

---

FN41.   "The size of the floating window should be twice the laboratory's quantitative match criterion.  For example, for a match criterion of ± 2.5%, the floating window for ceiling principle allele frequencies will be ± 5.0%, which is a total width of 10%." (*The Technical Working Group on DNA Analysis Methods (TWGDAM) Consensus Approach for Applying the "Ceiling Principle" to Derive Conservative Estimates of DNA Profile Frequencies* (1994) 39 J. Forensic Sci. 899, 901 [letter to the editor signed by 33 *TWGDAM* members, including 3 who identified themselves as affiliated with the FBI].)

---

In rejecting this claim, the California Superior Court held:

Petitioner's seventh and final claim is that the judgment should be reversed under the subsequently-decided case of <u>People v. Venegas</u> (1998) 18 Cal. 4th 47, because the probability projections for the DNA match between that of petitioner and the perpetrator was produced through Cellmark Laboratory's use of an improper floating bin calculation.  Petitioner claims that in <u>Venegas</u>, the California Supreme Court held that the modified ceiling approach should be used with a fixed bin method of comparing genetic markers, not the floating bin method that was used in this case.

Petitioner, unfortunately, does not point to the specific parts of the record in which any error under <u>Venegas</u> is clearly established.  Petitioner does not cite parts of the record showing the specific testimony that floating bins were used with regard to the ceiling principle in making the statistical calculations on the samples in this particular case.  Without such specific citations to the record, petitioner cannot establish a prima facie case.  The claim is therefore denied for failure to state with particularity the facts upon which the petitioner is relying to justify relief (<u>In re Swain</u> (1949) 34 Cal.2d 300), supported by documentary evidence or affidavits (<u>In re Harris</u> (1993) 5 Cal.4th 813, 827 fn. 5).

Even if this Court were to reach, the merits of the <u>Venegas</u> claim, it would be denied for a lack of showing of prejudice from <u>Venegas</u> error, if any.  The evidence of petitioner's guilt, apart from the DNA evidence, was strong, and it is not reasonably probable that the outcome would have been different had the DNA evidence not been introduced (<u>People v. Watson</u> (1956) 46 Cal.2d 818).

Unlike his petition to the Sacramento Superior Court, Petitioner points to the record in this case, RT 1943-2065, as establishing that the laboratory in this case used a window of less than 5%.  The Court has reviewed the 123 pages referred to by Petitioner and cannot find where the laboratory in this case used less than a 5% floating bin, even if 5% were the magic number. Indeed, nowhere in the referenced pages does the size of the floating bin used, expressed in terms of a percentage, appear.  A careful reading of *Venegas* indicates that the proper test is that

the size of the floating window (or bin) should be twice the size of the match; the 5% figure in *Venegas* coincided with twice the 2.5% size of the window used in that case and the example referred to in footnote 41 of that decision.  In this case, the testimony clearly establishes that the floating window (bin) was twice the size of the window.

> Q.  Now, how is - - how large is that - - that bin for frequencies?
>
> A.  For - - for the situation I've just described - -
>
> Q.  All right.
>
> A.  - - the bin will be two above - - you can sort of make it like we had two little arrows there - - from two above to two below.
>
> Q.  Okay. Two resolutions above and two resolutions below?
>
> A. Right.
>
> That --
>
> Q.  Double it?
>
> A.  We've doubled it on either side - - on both sides.
>
> Q.  Now -- now, does that vary at all whether it - - depending on where you are in the gel as to where the band lies?
>
> I mean whether it's top or bottom is it always going to - - is the frequency bin or window always going to be twice the match window?
>
> Q.  Okay.
>
> A.  Whatever the match window was this is twice above and twice below.
>
> Q.  Okay. And in the situation that you also indicated there was a possibility - - and that it didn't occur here.  But I just want to hit this very quickly - - that there is - - there are times on the same gel when you use a two resolution unit to determine a match; correct?
>
> A.  That's right.
>
> Q.  Okay. That would be two resolutions above and two resolutions below?
>
> A.  Four, yes.

Petitioner has failed to establish a *Venegas* error.  Even viewing the evidence in the light most favorable to Petitioner, it is, at best, inconclusive.

This Court cannot say that the decision of the Sacramento Superior Court was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by

the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Nor can this Court find that the Sacramento Superior Court unreasonably applied the correct legal principle to the facts of the prisoner's case as required by *Lockyer–Williams*; *i.e.*, the state court decision was more than incorrect or erroneous, its application of clearly established law was objectively unreasonable.

Petitioner is not entitled to relief on his sixth ground.

## CONCLUSION

The petition being both untimely and the decisions of the California Courts having rested on adequate independent state grounds, as well as not being entitled to relief on any ground on the merits, Petitioner is not entitled to relief.

**IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED THAT** the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the court declines to issue a Certificate of Appealability. 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) ("reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further" (internal quotation marks omitted)). The petition was filed untimely and all issues raised in the petition were denied by the California Courts on adequate independent state grounds. To the extent that it is presumed that the state courts ruled on the merits, no reasonable jurist could find their that the decisions were "objectively unreasonable."

If Petitioner wishes to appeal this adverse decision, he may either request this Court reconsider denial of the grant of a Certificate of Appealability, or directly petition the Ninth Circuit Court of Appeals and seek a Certificate of Appealability from that court. *See* Ninth Circuit Rule 22-1(d).

The Clerk of the Court to enter final judgment accordingly.

Dated at Anchorage, Alaska this 5th day of July, 2007.

s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
United States District Judge
